Hon. Kenneth **RUSH**, Plaintiff,

v.

**DEPARTMENT OF STATE, and National Security Council, Defendants.**

No. 88–8245–CIV–GONZALEZ.

United States District Court, S.D. Florida.

Oct. 11, 1990.

Martin L. Reeder, Jr., West Palm Beach, Fla., and David L. Sobel, Washington, D.C., for plaintiff.

Jason R. Baron, Washington, D.C., for defendants.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the Court upon the report and recommendation of the September 12, 1990, Hon. Lurana S. Snow, United States Magistrate for the Southern District of Florida. The magistrate's report recommended that the defendant's motion for summary judgment be granted.

Having reviewed, *de novo*, the Magistrate's report of September 12, 1990, the record, and the being otherwise duly advised, it is hereby:

ORDERED and ADJUDGED that the above-mentioned order of the Magistrate be ratified, affirmed, and made the Order of the District Court. This cause and the same shall be DISMISSED.

DONE AND ORDERED.

## REPORT AND RECOMMENDATION

LURANA S. SNOW, United States Magistrate.

THIS CAUSE is before the Court on the defendants' motion for summary judgment and was referred to United States Magistrate, Lurana S. Snow, for report and recommendation.

## FACTS

The plaintiff is a former United States Ambassador to the Federal Republic of Germany who was involved in the 1971 Quadripartite Negotiations (hereinafter "Berlin Negotiations") regarding the status of Berlin.

In addition to the official negotiations, President Richard Nixon and Dr. Henry Kissinger, then Assistant to the President for National Security Affairs, authorized the plaintiff to conduct secret discussions with officials of the Soviet Union. Correspondence between the plaintiff and Dr. Kissinger regarding the secret discussions was routed through a special "backchannel" established by Dr. Kissinger, rather than through official lines of communication. The correspondence consisted of the plaintiff's candid status reports, detailed analyses of the secret discussions, comments on proposed draft language for the agreement, and Dr. Kissinger's instructions and background information. The plaintiff retained copies of this correspondence.

In March 1977, the plaintiff transmitted his copies of the correspondence, which he described as "highly secret," to the Department of State (hereinafter "DOS") for inclusion in the Berlin Negotiation files. (Docket Entry 1, Exhibit A.)

On April 22, 1986, the plaintiff sought declassification and release of the documents for research and possible publication. (Docket Entry 1, Exhibit B). The DOS processed the request pursuant to the Freedom of Information Act, 5 U.S.C. §§ 552 (hereinafter "FOIA"). The DOS reviewed 59 documents and refused to declassify and release 20 of them; the remaining 39 documents were sent to the National Security Council (hereinafter "NSC") for its review. (Docket Entry 1, Exhibit F.)

The plaintiff appealed to the DOS regarding the 20 withheld documents; the DOS referred the documents to the NSC for further review. On May 24, 1988, the plaintiff instituted this action seeking release of the 20 documents. On July 11, 1988, the NSC fully declassified 18 and partially declassified 2 of the 39 documents originally referred to it; the documents were released in October 1988. (Docket Entry 26, Exhibit B.)

On August 25, 1988, the plaintiff filed a motion to compel preparation of a Vaughn index for all of the documents originally requested but not fully released (Docket Entry 15). After the Court determined it had jurisdiction to hear the action (Docket Entry 56), the Vaughn index for the 41 documents was filed attached to an affidavit submitted as an exhibit to the defen-

dants' motion for summary judgment. (Docket Entry 62, Exhibit A1.)

The documents include 27 documents authored by the plaintiff, 13 authored by Dr. Kissinger and one of unknown origin. The unclassified affidavit of Nancy V. Mehan, Senior Director for Information Policy at the NSC, states that 40 of the documents were classified "Top Secret" at origination; one had no original classification. Pursuant to Executive Order No. 12356 the 41 documents were examined by the affiant and 39 were reclassified "Secret," parts of the other two were classified "Secret."

Documents properly classified "Secret," pursuant to an Executive Order authorizing such classification in the interest of national defense or foreign policy, fall within FOIA exemption (b)(1), 5 U.S.C. § 552(b)(1), and may not be released.

Section 1.1(a)(2) of Executive Order 12356 requires a "Secret" classification for information which, if disclosed without authorization, could be expected to cause serious damage to the national security. The categories of information which may be classified "Secret" are listed in section 1.3(a). A document which falls into a category of 1.3(a) will be classified "Secret" if the classifying authority "determines that its unauthorized disclosure, either by itself or in the context of other information, reasonably could be expected to cause damage to the national security." Section 1.3(b).

Section 1.3(a)(3) encompasses "foreign government information," defined in section 6.1(d) as information provided by a foreign government or by the United States as part of a joint arrangement with a foreign government, with the expectation that the information and/or its source will be held in confidence. The unclassified affidavit states that information exchanged through special diplomatic channels is vital to the formulation of foreign policy and the confidentiality of such information must be protected. Thirty-three of the documents were deemed to contain foreign government information.

All of the documents were classified "secret" pursuant to Section 1.3(a)(5) of Executive Order 12356, as information related to the foreign relations or foreign activities of the United States. The unclassified affidavit states that continued cooperation between the United States and foreign countries may be impaired if the documents are released.

Next, the unclassified affidavit considers the requirement of section 1.3(b), danger to national security. The documents concern foreign individuals still living who are government officials or influential in foreign relations matters in their country. Moreover, the role of Germany in Europe is currently a major issue in international relations. Ms. Menan concludes the release of the documents poses a reasonable threat to the continued cooperation of foreign countries.

The unclassified affidavit states 40 of the documents also fall within FOIA exemption (b)(5), 5 U.S.C. § 552(b)(5), which exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." The information and instructions contained in the documents includes drafts of material not included in the final agreement and pre-decisional recommendations. The affiant states that disclosure, even by one of the correspondents, could inhibit future frank internal discussions on foreign policy.

The affiant states the documents were classified after consideration of the effects of the passage of time, consideration of the literature regarding the Berlin Negotiations currently in the public domain—including publications by the plaintiff and Dr. Kissinger, and with an eye to releasing reasonably segregable portion of the documents.

Attached to the unclassified affidavit is the Vaughn index—a list of the documents, a description of each document, its classification category or categories pursuant to section 1.3(a) of Executive order 12356, and the FOIA exemptions which apply to that document.

The plaintiff's response to the motion for summary judgment contends the documents were not properly classified "Secret," and thus do not fall within FOIA

exemption (b)(1). He also argues the documents do not merit the (b)(5) exemption. In support of this proposition the plaintiff has provided his own affidavit, summarized below.

After listing his extensive background in the field of foreign relations on behalf of the United States, the plaintiff avers that based on his knowledge of the contents of the documents, most of which he authored, he firmly believes release of the information could not possibly damage national security. He states the documents have educational value for diplomats.

He also contends Ms. Menan erred in classifying the documents because she was not familiar with the conditions surrounding the secret discussions. The plaintiff states that the Soviet officials never conditioned their discussions on the expectation of confidentiality; the United States insisted on confidentiality only to protect the existence of the talks, not the content of them. The plaintiff later disclosed the existence of the secret discussions to foreign negotiators with no adverse impact on United States foreign relations. Indeed, Dr. Kissinger's published memoirs confirm the existence of the secret discussions. The plaintiff also states the secret discussions did not deal with facts, but rather with issues, thus the secret exchange involved no information. Accordingly, the plaintiff states that none of the documents should have been categorized pursuant to section 1.3(a)(3) of Executive Order 12356.

The plaintiff further contends Ms. Menan's unclassified affidavit lacks sufficient specificity to support a "Secret" classification pursuant to section 1.3(a)(5), foreign relations or foreign activities of the United States.

He also states that the individuals involved, as well as their respective heads of state, are either dead or retired. Accordingly, the plaintiff concludes the potential damages Ms. Menan predicts as a result of disclosure are not possible.

The plaintiff also avers that FOIA exemption (b)(5) for inter-agency or intra-agency documents does not apply because neither the plaintiff nor Dr. Kissinger were acting on behalf of any agency. The affi-

davit states President Nixon told the plaintiff specifically that he was not acting on behalf of DOS with respect to the preparation and transmission of the documents. He also states (b)(5) was not designed to prevent disclosure by the author of the documents.

Finally, the plaintiff's affidavit contends that Ms. Menan failed to appreciate that the passage of time has endowed these documents with historical value. Their release is not objectionable since they relate to a situation strikingly different from today's circumstances.

The plaintiff also submitted a portion of Dr. Kissinger's 1978 memoirs related to the plaintiff's secret discussions with the Soviets during the Berlin Negotiations, and a copy of a DOS publication of a speech given by the plaintiff in Berlin in 1971 [which refers ellipticaly to special attention paid to the Soviet officials by President Nixon, and contains brief descriptions of several proposed drafts of the final agreement]. The plaintiff also supplied a copy of his foreward to Catudal's 1976 book on the Berlin Agreement. The foreward mentioned the plaintiff's private talks with the Russians. It also noted that many of the documents surrounding the private discussions were highly classified and that the plaintiff was restricted from disclosing information to Mr. Catudal.

The defendants' reply in support of their motion for summary judgment contains the declaration of Mr. Curtis Kamman, Acting Assistant Secretary of State for European and Canadian Affairs with responsibility for relations with those countries involved in the Berlin Negotiations. Mr. Kamman reviewed the 41 documents and concluded that the classification of the documents was proper pursuant to Executive Order 12356. Mr. Kamman also stated that the documents contain highly sensitive exchanges at a senior level of government; their release would be damaging to our policy interests in Europe.

Finally, the defendants offered the classified affidavit of Ms. Menan for the Court's *ex parte, in camera* inspection. Finding that the original Menan affidavit and

Vaughn index of necessity lacked certain specifics, which limited the Court's ability to determine the sufficiency of the classification process, the undersigned conducted an *ex parte, in camera* examination of the classified affidavit. The affidavit provided more specific information supporting the classification of the documents pursuant to categories 1.3(a)(3) and (5) of Executive Order 12356.

In particular, Ms. Menan discussed the plaintiff's allegations (1) that the Soviets never conditioned the discussions on an expectation of confidentiality; (2) that the Soviets have waived the confidentiality of the discussions; (3) that the discussions did not involve the provision of information from one side to the other; (4) that there is no possibility that damages would result from disclosure of the documents; (5) that all principals are dead or retired; and (6) that the documents reflect only matters on which a "settled" policy position existed. Ms. Menan's classified affidavit offers a factual rebuttal to these arguments.

## RECOMMENDATIONS OF LAW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence must be viewed in the light most favorable to the non-moving party. *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987).

### I. *Exemption (b)(1)*

■ Exemption (b)(1) applies to "matters that are—(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The defendants argue the documents were properly classified "Secret" pursuant to Executive Order 12356. The plaintiff contends the defendants failed to show that the documents fall into the criteria of sections 1.3(a)(3) and (5) of Executive Order No. 12356 or that the documents were properly classified as "expected to cause serious damage to the national security" pursuant to section 1.3(b) of that order.

"An agency is entitled to summary judgment if its affidavits 'describe the withheld information and the justification for withholding with reasonable specificity, demonstrating a logical connection between the information and the claimed exemption ... and are not controverted by either contrary evidence in the record or by evidence of agency bad faith.'" *Abbotts v. Nuclear Regulatory Commission*, 766 F.2d 604, 606 (D.C.Cir.1985) (citations omitted).

> [T]he district court is now required to conduct a de novo review of the classification, with the burden on the agency claiming the exemption. In carrying out this de novo review, courts should "accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the record," albeit without relinquishing their independent responsibility.

*Goldberg v. U.S. Dept. of State*, 818 F.2d 71, 77 (D.C.Cir.1987) (citations omitted), *cert. den.*, 485 U.S. 904, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988).

The plaintiff stresses that the *Goldberg* court would uphold the government classification unless the plaintiff could provide "direct or extrinsic evidence from the ambassadors or others, that the later classification was in error." *Id.*, at 80. The plaintiff's "contrary evidence must somehow undermine or call into question the correctness of the classification status of the withheld information, or the agency's explanation for the classification." *Id.*, at 81. The plaintiff contends his affidavit is sufficient to meet this standard. The Court also notes that since the plaintiff knows the full contents of the documents, he was able to frame his affidavit with unusual specificity, within the confines of the security classification imposed by the defendants.

The Court will first consider whether the documents were properly categorized pursuant to Executive Order No. 12356, and if

so, whether the documents were properly classified pursuant to that order.

### A. Category 1.3(a)(3), Foreign Government Information

Foreign government information is defined in section 6.1(d) of Executive Order No. 12356 as

(1) information provided by a foreign government ... with the expectation, expressed or implied, that the information, the source of the information, or both are to be held in confidence; or (2) produced by the United States ... as a result of a joint arrangement with a foreign government ... requiring that the information, the arrangement, or both are to be held in confidence.

Ms. Menan's unclassified affidavit states that 33 of the documents contain foreign government information. A review of the Vaughn index for the documents classified pursuant to category 1.3(a)(3) indicates these contain frank and candid analysis and progress reports on the negotiations, including Soviet reaction to certain events, and drafts of parts of the agreement that were not retained in the final version. [The documents not classified pursuant to category 1.3(a)(3) are generally instructions sent from Dr. Kissinger to the plaintiff.] Ms. Menan stresses that such diplomatic information supplied to and from the United States in confidence must remain confidential if the United States is to foster its relations with foreign countries.

The plaintiff's affidavit states there was no requirement or expectation of confidentiality on the part of the Soviets, and that the strict confidentiality imposed by the United States related only to the existence of the secret discussions, not to their contents. He further avers that none of the secret discussions involved information or facts, but merely issues.

He argues that Ms. Menan can only assume there was an expectation of confidentiality, whereas the plaintiff can state with certainty there was none. He asserts that Dr. Kissinger's memoirs and even a 1972 DOS publication revealed the existence of the secret discussions, thus there is no longer any need for classification of the documents.

The Court is guided by the holding of the *Goldberg* court. The plaintiff in *Goldberg* asked the court to infer that certain documents should not be classified because their authors, all ambassadors, did not classify the documents on origination. The *Goldberg* court refused to do so absent direct evidence from the ambassadors. The instant plaintiff asks the Court to infer the Soviets had no expectation of confidentiality because he has provided evidence the confidentiality was imposed by the United States. There is no proof the Soviets considered the matter unconfidential.

The entire correspondence deals with secret discussions between Soviet officials and a representative of the President of the United States. The correspondence was too sensitive for normal diplomatic channels. The plaintiff's affidavit is insufficient to show the Soviets had no expectations of confidentiality in such a situation.

The plaintiff's argument that the documents contain no facts given by foreign governments is too conclusory for analysis. The Vaughn index shows 15 of the documents contain Dr. Kissinger's or the plaintiff's analysis of draft language. All of the 33 documents contain candid analysis of the negotiations. Clearly negotiations of an international agreement cannot take place in a vacuum of policy; at some point there must be consideration of the facts of the situation.

Additionally, the plaintiff argues that once the existence of the secret discussions was made public as early as 1972, the only reason for secrecy disappeared. This is belied by the plaintiff's own characterization of the documents as "highly secret" when he transferred them to the DOS in 1977.

The defendants have provided evidence the documents were properly classified pursuant to Category 1.3(a)(3). The plaintiff's affidavit is insufficient to rebut that evidence. Moreover, it is readily apparent from the matters contained in the classified affidavit of Ms. Menan that the plaintiff was aware that the negotiations were to be

kept secret and that the Soviets expected secrecy to be maintained.

### B. Category 1.3(a)(5), Foreign Relations Information

Ms. Menan found that all 41 of the documents contained foreign relations information. While category 1.3(a)(5) does not require any expectation of confidentiality, Ms. Menan concluded that disclosure of these documents, related to secret international negotiations, could hinder future cooperation among countries.

The plaintiff states that Ms. Menan's rationale is too conclusory to warrant classifying the documents. He states there is no possibility of her proposed damages.

Foreign relations information has been held to include cables between DOS and a United States embassy relating to "comments and strategy with respect to ongoing informal discussions with British officials ... and information received informally by the United States from a third government." *British Airports Authority v. United States Dept. of State*, 530 F.Supp. 46, 48 (D.C.Cir.1981). The plaintiff has not provided evidence that the documents are not foreign government information. Also, a review of Ms. Menan's classified affidavit supports the defendants' argument that disclosure could hinder future cooperation among nations.

### C. Section 1.3(b), Danger to National Security

If a document falls into one of the ten categories listed in section 1.3(a), it must then be evaluated pursuant to Section 1.3(b). Section 1.3(b) requires a "Secret" classification of information, the unauthorized release of which, by itself or in the context of other information, reasonably could be expected to cause damage to the national security.

Ms. Menan's unclassified affidavit states that release of the classified information in the 41 documents reasonably could be expected to cause damage to the national security. More specifically she found that the information concerned persons still involved in foreign relations in various countries. Mr. Kamman's declaration states

the same conclusion, with special emphasis on the German situation today.

The plaintiff's affidavit states the persons involved are either dead or retired. He contends that disclosure of the fact of the secret discussions has not caused any damage to the national security, nor can release of the documents themselves. Indeed he sees a benefit for today's diplomats.

"The question that Congress has placed before [the court] is only whether the predicted danger is a reasonable expectation; and it is precisely on this point that a court, lacking expertise in the substantive matters at hand, must give substantial weight to agency statements, so long as they are plausible and not called into question by contrary evidence or evidence of agency bad faith." *Halperin v. Central Intelligence Agency*, 629 F.2d 144, 149 (D.C.Cir. 1980).

The plaintiff is not alleging bad faith (although he notes a governmental tendency toward unnecessary classification). Instead, he states the contrary evidence of his affidavit is sufficient to overcome the affidavits of Ms. Menan and Mr. Kamman.

The defendants' reply brief and supplemental authority cite many cases in which courts have held that an affidavit submitted by an individual with expert knowledge (or even the author of the document) is insufficient to overcome an agency decision regarding national security. *McTigue v. United States Department of Justice*, 84–3583, slip op at 9 (D.D.C. Dec. 3, 1985), *affd.* 809 F.2d 930 (D.C.Cir.1987); *Gardels v. Central Intelligence Agency*, 689 F.2d 1100, 1106 n. 5 (D.C.Cir.1982).

The Court cannot find the plaintiff, who retired from government service in 1977, has rebutted the defendants' unclassified affidavit which states that unauthorized release of these documents could reasonably be expected to damage national security. In addition, the classified affidavit refutes the plaintiff's contention that all the individuals involved in the negotiations are dead or retired.

The plaintiff also argues that the documents cannot be classified secret pursu-

ant to section 1.3(b) because the information has already been officially released. *LaMont v. Department of State*, 475 F.Supp. 761, 772 (S.D.N.Y.1979). The plaintiff provided three examples of prior release of the material: a copy of a DOS publication reprinting a speech the plaintiff delivered in Berlin in 1971, a portion of Dr. Kissinger's 1978 memoirs, and a copy of the plaintiff's foreward for a 1976 book written by Mr. Honore Catudal.

The defendants note that only the first is an official publication. Unofficial disclosure does not prevent an agency from classifying the same or similar material; only official disclosure confirms a governmental position. *Afshar v. Department of State*, 702 F.2d 1125, 1130 (D.C.Cir.1983).

The only reference to the secret discussions in the official publication is:

I would like to note at this point a particularly important element of these negotiations—and one that was a source of great strength to me. I am speaking of the direct personal interest which President Nixon maintained in the progress of the negotiations. Prior to the beginning, he formulated the American negotiating objectives. During the talks I was in touch with him frequently and received from him direct and frequent guidance. The President intervened personally with Soviet officials to overcome difficulties which arose during the course of the negotiations, particularly at one point when the Soviet negotiators appeared unwilling to discuss the central access issue until they first received satisfaction about the reduction of the Federal German presence in the Western sectors.

Department of State publication of the plaintiff's September 21, 1971, speech before the Chamber of Commerce and Industry of Berlin, Docket Entry 66, Exhibit C, pages 4–5.

The plaintiff contends that the only classified aspect of the secret discussion was the existence of the discussions. The defendants argue the contents of the discussions are classifiable. While the Court agrees that the existence of the secret discussions may have been officially released soon after the signing of the Berlin Agreement, the Court does not find that the substance of those secret discussions has ever been officially released with the specificity in the documents sought.

Even if the Court considers the two non-official publications, they do not reveal the substance of the documents the plaintiff now seeks to release. The plaintiff's foreward specifically refers to the security considerations which prevented him from discussing the substance of the secret discussions with Mr. Catudal. Dr. Kissinger's memoirs carefully omit reference to the substance of many of the discussions, and refer generally to "concessions," "procedures" and "drafts."

Accordingly, the plaintiff has not demonstrated any official publication of the information contained in the documents. The defendants are not barred from classifying the documents.

D. Section 1.2, Classification Authority

■ Section 1.2 of Executive Order 12356 enumerates those persons authorized to classify information pursuant to the Executive order. Ms. Menan states she has been delegated authority to classify NSC and White House national security information pursuant to Executive Order No. 12356.

The plaintiff contends that only the DOS can declassify the documents and the NSC has no authority to do so. The defendants argue that the documents were White House records at origin, thus pursuant to 22 C.F.R. §§ 171.70–71 and Executive Order 12356 section 3.1(a) they were properly reviewed by the NSC.

Clearly these documents were generated at the instance of President Nixon and Dr. Kissinger, who was Assistant to the President for NSC. This Court has already found the records were controlled by the DOS, who consulted with the NSC. Pursuant to the 22 C.F.R. §§ 171.70–71 and Executive Order No. 12356, the NSC had authority to classify the documents.

II. *Exemption (b)(5)*

■ Exemption (b)(5) applies to intra-agency and inter-agency memoranda or records not available by law to a party

other than an agency in litigation with the agency. All documents, except the document of unknown origin, were classified pursuant to 5 U.S.C. § 552(b)(5). Ms. Menan's unclassified affidavit states that disclosure of the 40 documents could impede the free flow of recommendations and other necessary exchanges and hamper the formulation of policy on national security related issues. Some of the documents contain suggested wording ultimately not incorporated in the final agreement. The documents are classified as pre-decisional deliberative material.

The plaintiff contends exemption (b)(5) does not apply when the author of a document seeks its release. Nor does the exemption apply to final policy directives. The (b)(5) exemption only applies to pre-decisional, deliberative communications. *Jordan v. United States Dept. of Justice*, 591 F.2d 753, 774 (D.C.Cir.1978). The plaintiff contends the United States' position was settled before the secret discussions began, thus none of the communications were pre-decisional or deliberative.

However, the (b)(5) exemption also applies to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980). The exemption is meant to protect "the often frank exchange among United States officials ... of draft documents, and strategies relating to the evolving position of the United States Government...." *British Airports Authority v. United States Dept. of State*, 530 F.Supp. 46, 49 (D.C.Cir.1981).

While the plaintiff is correct that the United States had specific goals during the Berlin Negotiations, this does not preclude the development of interim strategies and evolving positions with regard to the secret discussions. The Vaughn index describes these documents as an exchange of detailed and candid analyses, progress assessments and constantly updated specific instructions.

The plaintiff, who knows the contents of the documents, does not dispute the descriptions in the Vaughn index. However, he characterizes the exchange as the implementation of existing policy, which is not exempt under (b)(5). *Jordan, supra,* 591 F.2d at 774.

Based on the facts of this case, the *British Airports Authority* decision is more directly on point. Clearly the documents fall within the (b)(5) exemption.

■ Nor has the plaintiff provided any authority suggesting that the author, who is not now a member of the controlling or classifying agency, can waive the (b)(5) exemption both for himself and his correspondent (who authored nearly one third of the documents). Exemption (b)(5) has been characterized as the statutory counterpart to the privileges normally available to parties in civil discovery. *Coastal States Gas Corp., supra,* 617 F.2d at 862. The defendants are correct that the relevant privilege for communications between the President's top officials and those who advise them is the Executive privilege, which cannot be waived by the plaintiff. *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974). The defendants have provided persuasive argument that the privilege cannot be waived by the plaintiff.

Accordingly, the (b)(5) exemption has been properly applied to the 40 documents, and they are exempt from disclosure.

## CONCLUSION

The defendants have provided evidence that the documents were properly categorized and classified by a person authorized to make such classifications. The plaintiff has failed to provide evidence sufficient to rebut the defendants' evidence. Accordingly it is

RECOMMENDED that the defendants' motion for summary judgment be granted.

The parties will have ten days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Jose A. Gonzalez, United States District Judge. Failure to file objections timely shall bar the parties from attacking

on appeal factual findings contained herein. *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir.1982) (en banc).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 12th day of September, 1990.