Belknap
No. 87-459

WALTER H. BRENT

v.

F. ANDRÉ PAQUETTE *& a.*

December 8, 1989

416

*James L. Burke*, of Gilford, by brief and orally, for the plaintiff.

*Stanley H. Robinson*, of Franklin, by brief and orally, for the defendants, F. André Paquette, SAU 51, and the Alton School District.

THAYER, J. This case involves a private citizen's right under the Right-to-Know Law, RSA chapter 91-A (Supp. 1988), to inspect public records kept by the superintendent of schools, and a determination of whether or not specific record-keeping procedures are in conformity with the statute. At trial, the plaintiff, Walter H. Brent, alleged seven violations of the Right-to-Know Law. The Superior Court (*Smith*, J.) dismissed one of the counts at the close of the plaintiff's evidence, found technical violations with respect to three counts, and found no violations of the statute with regard to the remaining three counts. Mr. Brent raises six issues on appeal in which he claims that the trial court erred in dismissing one of his counts and in finding that Mr. Paquette had not violated the Right-to-Know Law with respect to his three remaining allegations. We affirm.

The history of this case begins with a series of letters from the plaintiff, in his capacity as a private citizen, to the defendant, in his capacity as the superintendent of School Administrative Unit (SAU) 51, requesting copies of various contracts and other public records kept at the office of the superintendent. On January 29, 1986, Mr. Brent requested by letter copies of bus service bids received by SAU 51. Mr. Paquette did not respond to this request, and on April 1, 1987, Mr. Brent sent another letter in which he requested the bid specifications as well as a copy of a particular

bus contract into which SAU 51 had already entered. Mr. Paquette did not satisfy either one of the plaintiff's requests, and on April 28, 1987, Mr. Brent filed suit under the Right-to-Know Law, RSA chapter 91-A (Supp. 1988). For the reasons that follow, we affirm all of the trial court's conclusions.

The issue Mr. Brent first raises on appeal concerns a letter he testified mailing on April 8, 1987, and a telephone call he testified making on April 10, 1987, both to Mr. Paquette, in which Mr. Brent expressed his intention of picking up copies of the bus contracts at the superintendent's office. The trial court found that, while the letter was apparently sent, it was not received, and that there was no telephone conversation on April 10, 1987. The plaintiff urges this court to find that the telephone conversation did take place, and that Mr. Paquette's refusal to provide Mr. Brent with copies of the requested contracts in response to this conversation constitutes a violation of Mr. Brent's right to obtain copies of public documents.

As support for its conclusion that there was no telephone conversation, the trial court found that "[d]efendant Paquette . . . denies knowledge of any April 10, 1987 phone conversation with plaintiff." While Mr. Paquette at trial denied receiving the April 8 letter, he did not testify concerning the telephone call the plaintiff claims he made on April 10. As Mr. Brent points out, his testimony regarding the April 10 conversation remains uncontroverted on the record. Based on his uncontested testimony, Mr. Brent asks this court to rule that the trial court's finding that the phone conversation did not occur is erroneous as a matter of law.

The plaintiff is in effect arguing that since he testified that the telephone conversation took place, and since the defendant failed to specifically deny that the conversation occurred, the trier of fact is required to find that the conversation took place. The law is well established, however, that the fact-finder may accept or reject, in whole or in part, the testimony of any witness or party. *Gordon v. Gordon*, 117 N.H. 862, 865, 379 A.2d 810, 813 (1977). Additionally, the trier of fact is not required to believe even uncontroverted testimony. *93 Clearing House, Inc. v. Khoury*, 120 N.H. 346, 350, 415 A.2d 671, 674 (1980).

In this case, there was evidence from which the court could have found that Mr. Paquette did not receive the April 8 letter. After hearing the testimony of both Mr. Brent and Mr. Paquette, the trial court apparently found Mr. Brent not credible when he testified to the telephone conversation. The court specifically rested its finding on the "testimony and relative credibility of the

witnesses." Since the trial court had the advantage of seeing and hearing the witnesses on the stand, we will not substitute our judgment for that of the trial court. *See Ryan v. Perini Power Constructors, Inc.*, 126 N.H. 171, 173, 489 A.2d 137, 138 (1985) (supreme court will not substitute its judgment for that of superior court unless findings cannot be supported by evidence). Accordingly, we hold that the trial court did not err in failing to find that Mr. Brent was denied access to certain documents.

The second assertion Mr. Brent makes on appeal is that the trial court erred in failing to find that the defendant's practice of routinely destroying tapes and notes used to prepare minutes of public meetings was a violation of the Right-to-Know Law. At trial, the defendant testified that his practice of preparing official minutes of school board meetings includes making written notes and tape-recording motions during the course of the meetings, and later composing the minutes from these sources. Mr. Paquette dictates the minutes onto his personal dictaphone, and his secretary then transcribes the minutes from the dictation tapes. Once the school board approves the minutes, Mr. Paquette routinely throws his notes away, recycles his dictation tapes, and erases the tapes made during the meetings with a bulk eraser. While the dictation tapes are not at issue on appeal, Mr. Brent claims that the public has the right to inspect the tape-recorded motions and handwritten notes. Although the trial court did not elaborate on how it arrived at its conclusion, the court found that there was no violation of the law with respect to the tapes and notes. For the reasons that follow, we agree.

■ The pertinent provisions of the Right-to-Know Law provide:

"I. Every citizen during the regular or business hours of all such bodies or agencies, and on the regular business premises of such bodies or agencies, has the right to inspect all public records, including minutes of meetings of the bodies or agencies, and to make memoranda, abstracts, and photographic or photostatic copies of the records or minutes so inspected . . . .

II. After the completion of a meeting of such bodies or agencies, every citizen, during the regular or business hours of all such bodies or agencies, and on the regular business premises of such bodies or agencies, has the right to inspect all notes, materials, tapes or other sources used for compiling the minutes of such meetings . . . ."

RSA 91-A:4, I, II (Supp. 1988). Paragraph I of the statute, which was first enacted in 1967, sets forth the general rule that citizens have the right to inspect public records, which include the minutes of public meetings. Paragraph II of the statute, which was added in 1983, provides that after a meeting has been concluded, citizens have the right to review the source notes relied on to prepare the minutes of that meeting. However, paragraph II does not indicate that the source notes need to be preserved once the minutes have been prepared. Although paragraph II provides for public inspection of source notes, it seems to create a subcategory within public records. If the legislature intended the source notes to be as available to the public as the minutes, it could have amended paragraph I to include source notes, in addition to minutes. Instead of doing this, however, it added paragraph II. Relying on a plain reading of the statute, an ambiguity exists as to the meaning of paragraph II. Hence, we must resort to legislative history to determine legislative intent. See Appeal of Public Serv. Co. of N.H., 125 N.H. 46, 52, 480 A.2d 20, 24 (1984) (no need to rely on legislative history for statutory interpretation in absence of ambiguous language). When the legislature amended the statute in 1983 and added the provision quoted above, the House Judiciary Committee indicated that "the material from which the minutes are prepared (notes, tapes, etc.) shall be open for inspection *during the time period* in which the minutes are being prepared" (emphasis added). N.H.H. JOUR. 428 (1983). Therefore, paragraph II is not to be construed as broadly as paragraph I, and Mr. Paquette is not required to make his source notes available to the public after the final minutes are prepared. Mr. Paquette testified that the notes and tapes made during the course of public meetings are kept by either his secretary or himself until after the minutes are approved by the board. Since the statute does not require him to retain the source notes and tapes after the board approves the minutes, we affirm the trial court's conclusion that Mr. Paquette was not in violation of RSA 91-A:4, II (Supp. 1988) by continuing to throw his notes away and erase the tapes after the minutes are approved.

With respect to the third issue raised on appeal, Mr. Brent claims that the trial court erred in finding that a tape recording of the plaintiff's remarks, made by the superintendent during a public meeting, was not a public record. The trial court found that the tape was unofficial and made solely for the defendant's personal use. As such, the court concluded that the tape was not a public record subject to the Right-to-Know Law. The record supports the lower court's findings, and we affirm.

The record indicates that the governing board of SAU 51 held a meeting on June 4, 1987, during which renewal of the superintendent's contract was discussed. Mr. Paquette testified that during the meeting, Mr. Brent began saying things about the defendant which the defendant considered slanderous. The defendant recorded the inflammatory remarks on his personal dictaphone for his own use in the event that he decided to take legal action against Mr. Brent in the future. Mr. Paquette testified that he did not use this tape in preparing the official minutes of the meeting.

The plaintiff agrees with the trial court's finding that Mr. Paquette made the tape for his personal use and did not use it in preparation of the official minutes. However, the plaintiff disagrees with the court's conclusion that the tape is not a public record. The basis for the plaintiff's contention is that the superintendent is responsible for taping the meetings and preparing the minutes, and therefore, any tape made during a public meeting necessarily becomes a public record. In his brief, Mr. Brent argues that the trial court's ruling creates an exception to the "usual rule" that tapes made by the person charged with preparing the minutes are public records. Curiously absent from the plaintiff's argument, however, is a reference to any case or statutory authority to support his position.

Mr. Brent alleges that the trial court's conclusion is a "clear invitation to abuse of our Right-to-Know Law," yet he alleges no such abuse in this case. The plaintiff explains that if a citizen sees the record-keeper taping portions of a public meeting and wants to hear the tape before the minutes are produced, the keeper of the minutes will be legally entitled to deny the request until he or she decides what parts of the tape, if any, will be used to prepare the minutes. As the defendant correctly notes, however, Mr. Brent is erroneously focusing on what portions of a tape are used to prepare the minutes, rather than on the *purpose* for which a particular tape is made. There is no statutory definition of what constitutes a public record. According to the Right-to-Know Law, the public is entitled only to those tapes used to prepare the minutes of public meetings up to the time the minutes are prepared and approved. RSA 91-A:4, II (Supp. 1988). The public is not entitled to those tapes made by the record-keeper which do not have an official purpose.

The fourth argument the plaintiff makes on appeal is that the trial court erroneously found that a government official could require a citizen to make an appointment as a precondition to reviewing public records. The trial court noted that while the Right-to-Know Law gives a citizen the right to on-the-premises

inspection, the statute does not indicate whether or not an official can require a citizen to make an appointment before examining the records. The court reasoned that an appointment does not prevent a citizen from inspecting public records, and concluded that requiring an appointment insures the "smooth and efficient functioning of the bureaucracy in providing public information." We agree with the trial court that requiring a citizen to make an appointment before reviewing public records does not necessarily violate the statutory scheme.

The record discloses that throughout the spring of 1987, the defendant received numerous requests from Mr. Brent for tapes, contracts, and other public documents which are normally kept at the superintendent's office. In an apparent effort to satisfy the plaintiff's requests, Mr. Paquette suggested that Mr. Brent make an appointment to review the particular documents he wished to see. Mr. Brent responded that rather than make an appointment, he preferred to "drop by" whenever he wanted to "check something at the SAU office." Mr. Brent argues before this court that the provisions of the Right-to-Know Law guarantee citizens the right to inspect public records at specified locations and during certain hours, and that they do not permit a government official to require a citizen to make an appointment before such examination occurs. As support for his position, Mr. Brent relies on the following paragraphs:

> "I. Every citizen during the regular or business hours of all such bodies or agencies, and on the regular business premises of such bodies or agencies, has the right to inspect all public records . . . .
>
> . . . .
>
> IV. Each public body or agency shall, upon request for any public record reasonably described, make available for inspection and copying any such public record within its files when such records are immediately available for such release. . . ."

RSA 91-A:4, I, IV (Supp. 1988). However, paragraph IV of the statute continues, and provides that if a public body is unable to make a public record available immediately, then it has up to five days either to make the record available or to deny the request in writing, with reasons. *See* RSA 91-A:4, IV (Supp. 1988). Clearly, the legislature envisioned circumstances in which public officials would not be able to satisfy a citizen's request immediately. While paragraph I provides that citizens are entitled to inspect public

records during business hours and at business offices, it does not indicate that citizens have the unfettered right to review the records in any quantity and wherever kept immediately upon demand. Similarly, while paragraph IV requires public officials to make public records which are reasonably described available for citizens to inspect, it does not require the officials to provide the records immediately after they are requested. The officials are directed to provide the records when they are immediately available for release; they are not directed to provide the records immediately after a citizen requests them.

Mr. Brent contends that by conditioning a citizen's right to inspect public records on the availability of an appointment, the trial court has added a restriction that the legislature did not intend. The plaintiff continues at length to describe all sorts of ways that the keepers of public documents could effectively discriminate among citizens by being "unavailable" to one citizen, and "adjust[ing] his schedule" to accommodate another. Although the plaintiff has hypothesized all sorts of ways in which the requirement of an appointment could result in a citizen's being unable to examine particular records, Mr. Brent has failed to produce any evidence that such abuse has occurred in this case. Mr. Paquette simply sent Mr. Brent a letter suggesting that they arrange a convenient time to review minutes of a particular meeting which Mr. Brent had previously requested. Instead of making an appointment, however, Mr. Brent responded that he would rather come by the office at his own convenience. Mr. Brent has introduced no evidence that he attempted to make an appointment and was refused, or that Mr. Paquette was "unavailable" to meet with him. There is evidence, however, that Mr. Paquette sent the plaintiff two additional letters indicating that he would personally be happy to arrange a time for Mr. Brent to review the minutes. This evidence indicates that not only was Mr. Paquette available to the plaintiff, but he went out of his way to assure Mr. Brent that he would personally arrange a time for the two to meet.

 The plaintiff alleges that requiring an appointment is an unnecessary and onerous burden to citizens, and contrary to the purpose of the Right-to-Know Law. We hold, however, that under the facts of this case, requiring citizens to arrange a mutually convenient time to examine public records perpetuates the underlying purpose of the statute. The preamble to the Right-to-Know Law provides that the purpose of the statute is "to ensure . . . the greatest possible public access to the actions, discussions and records of all public bodies . . . ." RSA 91-A:1 (Supp. 1988).

In those cases in which it is necessary, calling ahead to arrange a time to review particular documents assures citizens that they will be able to examine the records soon after they arrive at the office, and that they will not be told either to wait an indeterminate amount of time for someone to help them, or to come back later when the office is not so busy. Likewise, our public offices will be able to function more smoothly and efficiently if the keepers of the records can plan their days around pre-arranged appointments, and not be forced to interrupt their work whenever a citizen "drops by" to inspect a public record. For these reasons, we affirm the trial court's ruling that a government official does not necessarily violate RSA chapter 91-A (Supp. 1988) whenever he or she requests a citizen to make an appointment before reviewing a public record.

The fifth argument Mr. Brent makes on appeal is that the trial court erred in not finding that the defendant and other administrators unlawfully denied him access to public records on June 15, 1987. The record indicates that on June 15, 1987, Mr. Brent went to the office of SAU 51 and requested copies of both the superintendent's and the business administrator's contracts with the SAU. Mr. Brent testified that he was told these contracts could not be reviewed at that time because Mr. Paquette and Mr. Everngam, the business administrator, were "too busy." Mr. Paquette sent the requested contracts to the plaintiff two days later, but Mr. Brent alleged that by denying him access to the records when he was at the office, the superintendent violated the Right-to-Know Law. Because it found that the defendant's reason for the denial satisfied the requirements of RSA 91-A:4, IV (Supp. 1988), the trial court dismissed this count during trial.

■ With regard to making records available to the public upon request, the Right-to-Know Law as previously cited provides:

"IV. . . . If a public body or agency is unable to make a public record available for immediate inspection and copying, it shall, within 5 business days of request, make such record available, deny the request in writing with reasons, or furnish written acknowledgment of the receipt of the request and a statement of the time reasonably necessary to determine whether the request shall be granted or denied . . . ."

RSA 91-A:4, IV (Supp. 1988). The plaintiff argues that "if an official is going to deny access to a public document, that official has some burden to show why the document was unavailable for review when requested." The statute unambiguously states,

however, that if an official is unable to provide immediate inspection, he or she shall make the requested document available within five days, *or* deny the request in writing with reasons. *See* RSA 91-A:4, IV (Supp. 1988). The statute does not require the official to explain why the record was not immediately available if the official provides the citizen with the record within five days. *See* RSA 21:2; *State v. Collins*, 129 N.H. 488, 490, 529 A.2d 945, 947 (1987) (statutory words are to be interpreted according to their common meanings). Mr. Brent testified that on June 17, Mr. Paquette mailed him the contracts he requested on June 15, a mere two days after Mr. Brent visited the office. Hence, the trial court did not err when it concluded that Mr. Paquette did not violate the statute when he failed to provide the contracts to Mr. Brent immediately after he requested them.

Mr. Brent argues further that the trial court "rewrote the statute" when it replaced the statutory word "unable" with the phrase "too busy." As the plaintiff correctly points out, statutory words are to be interpreted according to their ordinary meanings. RSA 21:2. Webster's Third New International Dictionary 2481 (1961) defines "unable" as "not able." "Able" is defined as "possessed of . . . needed resources to accomplish an objective." *Id.* at 4. Clearly, if the officers at the SAU office were genuinely too busy to provide the contracts to Mr. Brent, they were not possessed of the necessary resources. The plaintiff would have this court rule that "unable," as it is used in paragraph IV of the statute, means "beyond voluntary achievment (sic)." We find that if the legislature intended "unable" to mean "beyond voluntary achievement," it would have inserted "beyond voluntary achievement" into the statute in lieu of "unable." In light of the fact that the legislature chose to include "unable," we will interpret the word according to its ordinary meaning. Therefore, we hold that the trial court correctly concluded that Mr. Paquette complied with the statute when it found that the defendant sent the contracts within the statutory time period, after telling Mr. Brent he was too busy to retrieve them immediately.

The sixth and final argument Mr. Brent makes on appeal is that the trial court erroneously found that a list of the names and addresses of the Alton School District children, and the names of their parents, is not a public record, and is not otherwise available for public inspection pursuant to established school district policy. There is evidence that on July 14, 1987, Mr. Brent requested by letter a list of the Alton school children's names and addresses, and the names of their parents, from the office of SAU 51. Mr. Paquette

was then on vacation, and did not respond to this letter until July 27, thirteen days after the original request. In his letter of response, the superintendent denied Mr. Brent's request, indicating that federal law (the Buckley Amendment) precluded him from releasing the requested information. The trial court concluded for several reasons that the superintendent did not violate RSA chapter 91-A (Supp. 1988) by denying the plaintiff access to this information.

As the trial court initially noted, the Right-to-Know Law guarantees every citizen the right to inspect all public records "except as otherwise prohibited by statute or RSA 91-A:5." RSA 91-A:4, I (Supp. 1988). The court found, however, that there was no "public record" containing the information requested by Mr. Brent. The record indicates that although the children's names, their addresses, and the names of their parents, appear on registration cards and attendance records, the requested information has never been compiled into a single list. Based on this evidence, the trial court determined, and we hold, that the statute does not require public officials to retrieve and compile into a list random information gathered from numerous documents, if a list of this information does not already exist. The fact that a list of the requested information does not already exist in this case distinguishes it from the cases Mr. Brent relies on in his argument that the students' names and addresses comprise a public record. *Cf. Menge v. Manchester*, 113 N.H. 533, 534, 311 A.2d 116, 117 (1973) (information plaintiff sought already on single document when request made).

Alternatively, the trial court found that even if the list requested by Mr. Brent qualified as a public record, both State and federal law preclude Mr. Paquette from disclosing this information. The Right-to-Know Law exempts from disclosure "[p]ersonal school records of pupils." RSA 91-A:5, III. The trial court concluded, and we agree, that since Mr. Brent is seeking access to information found only on the students' registration cards and attendance records, this information is part of the pupils' personal school records and therefore exempt from public inspection.

In addition to protecting students' personal records, the Right-to-Know Law also exempts from public disclosure "[r]ecords pertaining to . . . confidential . . . information . . . and other files whose disclosure would constitute invasion of privacy." RSA 91-A:5, IV (Supp. 1988). While this court has determined that this provision does not exempt teachers' contracts and salary information from

public inspection, *Mans v. Lebanon School Board,* 112 N.H. 160, 164, 290 A.2d 866, 868 (1972), we have not heretofore determined whether or not student names and addresses, and the names of their parents, are exempt. The *Mans* court developed a balancing test in which it weighed the benefits of disclosure against the benefits of nondisclosure to determine whether public inspection of the requested information would constitute an invasion of privacy. *Id.* at 162, 290 A.2d at 867; *see Perras v. Clements,* 127 N.H. 603, 605, 503 A.2d 843, 844–45 (1986) (court weighed benefits of disclosure against benefits of nondisclosure to determine whether public review of appraisal reports prepared by State invaded property owners' privacy). Applying this same test to the information requested by Mr. Brent, the trial court concluded that the benefits from not releasing the students' names and addresses, and their parents' names, outweighed the benefit to the public of reviewing this information. The court reasoned that disclosing this personal information would benefit neither society nor the children and their families, but would put the children "at the mercy of pedophiles and other criminals who could do them harm."

Other courts which have considered whether or not disclosing students' names and the addresses of individuals constitutes an invasion of privacy have determined that public inspection of this information invades the individuals' privacy. In *Kestenbaum v. Michigan State University,* 414 Mich. 510, 327 N.W.2d 783 (1982), the Supreme Court of Michigan held that the university was justified in denying the plaintiff's request for student names and addresses because the release of this information would constitute a "clearly unwarranted invasion of an individual's privacy." *Id.* at 522, 327 N.W.2d at 785. *But see, Intern. U., UPGWA v. Dept. of State Police,* 422 Mich. 432, 438–40, 373 N.W.2d 713, 714–15 (1985) (court found *Kestenbaum* not controlling and held that disclosing names and addresses of guards does not constitute "clearly unwarranted invasion of privacy"). The exemption under Michigan's right-to-know law is less encompassing than the exemption under our statute, because in Michigan the disclosure must constitute a "clearly unwarranted invasion of an individual's privacy," M.C.L. § 15.243, sec. 13(1)(a), whereas in New Hampshire the disclosure need only be an "invasion of privacy," RSA 91-A:5, IV (Supp. 1988). For the reasons that follow, we agree with the *Kestenbaum* court that releasing students' names and addresses invades the students' privacy.

As the Michigan court recognized, while not every interest a person has is or should be protected by the law, an individual's home has always been protected against external assaults to a greater extent than any other place. *Kestenbaum*, 414 Mich. at 524, 327 N.W.2d at 786; *see Boyd v. United States*, 116 U.S. 616, 630 (1886) (fourth and fifth amendments apply to invasions into sanctity of individuals' homes). Therefore, any intrusion into a person's home necessarily constitutes an invasion of privacy. *Kestenbaum*, 414 Mich. at 524–25, 327 N.W.2d at 786. From this premise, the Michigan court concluded that the disclosure of an individual's name and address is also an invasion of privacy because it serves as a "conduit into the sanctuary of the home." *Id.; cf. Rowan v. United States Post Office Dep't*, 397 U.S. 728, 738 (1970) (vendor has no right to mail unwanted material to home of another); *see Federal Labor Relations Authority v. Department of The Treasury*, 884 F.2d 1446, 1453 (D.C. Cir. 1989) (federal employees' privacy interests in names and addresses outweigh public's interest in disclosure); *Wine Hobby USA, Inc. v. Internal Revenue Service*, 502 F.2d 133, 137 (3d Cir. 1974) (disclosure of individuals' addresses constitutes invasion of privacy).

█ The trial court correctly balanced the competing interests of society and the individual students and their parents in finding that protecting from public disclosure the students' names and addresses, and the names of their parents, was more beneficial than releasing this information to the public. Based on the balancing test applied by the court, and on the conclusions reached by other jurisdictions when faced with similar questions, we hold that the trial court did not err when it found that providing the requested names and addresses to Mr. Brent would constitute an invasion of the students' and their parents' privacy under RSA 91-A:5, IV (Supp. 1988).

In addition to the prohibition against disclosure in RSA chapter 91-A, the trial court found that the Alton School District would risk losing federal funding if it provided student information to the public in a manner not consistent with the Buckley Amendment. The Buckley Amendment, which is codified at 20 U.S.C. § 1232g, provides that no federal funds shall be made available to any educational agency or institution which has a policy or practice of releasing or permitting the release of education records or other personally identifiable information, other than directory information, to any individual without the written consent of a student's parents. 20 U.S.C.A. §§ 1232g(b)(1) (Supp. 1989), 1232g(b)(2). The statute allows certain people, such as teachers and school officials,

to have access to this information absent parental consent. *See* 20 U.S.C.A. § 1232g(b)(1)(A)–(I) (1978 and Supp. 1989). However, insofar as Mr. Brent has chosen to bring this action in his capacity as a private citizen, he does not fall within any of the categories of persons entitled to the students' education records without first obtaining the requisite parental consent.

Education records are defined as records, files, or documents which contain student information, and which are maintained by an educational agency or institution. 20 U.S.C.A. § 1232g(a)(4)(A). Directory information contains, among other things, a student's name, address, date and place of birth, and telephone number. 20 U.S.C.A. § 1232g(a)(5)(A). Although sections 1232g(b)(1) and (2) allow the release of directory information absent parental consent, section 1232g(a)(5)(B) provides that:

> "Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent."

20 U.S.C.A. § 1232g(a)(5)(B).

The Alton School District is a recipient of federal funds. As superintendent of SAU 51, Mr. Paquette testified that the school district had not adopted a policy regarding directory information. There is evidence that the district had a "Special Education Plan," which provided that directory information, including a student's name, address, and telephone number, could be disclosed without parental consent. However, this plan did not contain any provisions concerning public notice or comment by parents, as required by the Buckley Amendment. *See* 20 U.S.C.A. § 1232g(a)(5)(B). Consequently, the Special Education Plan is not in conformity with the Buckley Amendment, and the school district would risk losing federal funding if it released the directory information without notifying the public of the types of information it was designating as directory, and without giving parents an opportunity to request that certain information not be released. *See* 34 CFR § 99.37 (1988) (educational institution may not disclose directory information without providing public notice to parents and giving them opportunity to refuse to have such information designated

"directory"). For these reasons, we hold that the trial court was correct in concluding that Mr. Paquette did not violate established school district policy or the statute when he refused to provide Mr. Brent with the information he sought.

Separate and apart from his claim that Mr. Paquette should have provided him with the names and addresses of the students, and the names of their parents, Mr. Brent alleges that Mr. Paquette violated the Right-to-Know Law when he failed to respond to the plaintiff's request for the information until thirteen days after it was made. To recount the facts, Mr. Brent made a written request for the names and addresses on July 14, 1987, which happened to be during Mr. Paquette's vacation. The defendant testified that he became aware of the request when he returned from his vacation on July 20, that he dictated a response on July 25, and that his secretary transcribed the letter on July 27, 1987.

The evidence indicates that Mr. Everngam, the business administrator, did not have the authority to provide Mr. Brent with the names and addresses the plaintiff requested, and that he told Mr. Brent that he could not respond to the plaintiff's request for this information. The trial court found, and we agree, that the defendant responded to the plaintiff's request in a timely manner, upon his actual knowledge and receipt of the plaintiff's letter.

In this case, Mr. Paquette appeared to be the only school official with the authority to determine whether or not the names and addresses of the students, and the names of their parents, constituted a public record such that they should have been made available to Mr. Brent. The unavailability of a particular public official in most cases is irrelevant to a citizen's right to inspect public records. However, when the other officials are reasonably unsure whether specific records should be released to the public because of the nature of the information contained therein, and their concern is reasonable, then the availability of a particular official becomes very relevant to a citizen's right to this information. Mr. Paquette testified that he was away on vacation when Mr. Brent submitted his written request for the students' names and addresses. He also testified that he did not receive actual notice of Mr. Brent's request until Monday, July 20. Under these circumstances, the computation of the 5-day period within which Mr. Paquette was required either to make the requested information available or deny the request in writing begins on July 20. *See* RSA 91-A:4, IV (Supp. 1988).

Monday, July 20, is not included in the computation of the 5-day period. *See* RSA 21:35 ("When time is to be reckoned from a day, . . . such day . . . shall not be included in the computation."). Therefore, since the fifth business day thereafter was Monday, July 27, the day Mr. Brent's request was denied, we hold that the trial court did not commit error when it concluded that the defendant complied with the statute and responded to the plaintiff's request in a timely manner.

For the above reasons, we affirm the decision of the trial court and, accordingly, deny Mr. Brent's request for attorney's fees and costs.

*Affirmed.*

All concurred.